# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RICHARD ANTHONY JENKINS**, | Case No. 3:15-cv-558-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **STEVE SHELTON,** Director of Health Service, Oregon Department of Corrections**; MS. AIMEE HUGHES; MS. ASHLEY CLEMENTS; MR. GARTH GULICK; MR. JAMES TAYLOR; MR. KENNETH LITTLE,** | |
| Defendants. | |

Mark G. Passannante, BROER & PASSANNANTE, PS., 1001 SW 5th Avenue, Suite 1220, Portland, OR 97204. Of Attorneys for Plaintiff.

Ellen F. Rosenblum, Attorney General, Nathaniel Aggrey and Vanessa A. Nordyke, Assistant Attorneys General, DEPARTMENT OF JUSTICE, 1162 Court Street NE, Salem, OR 97301. Of Attorneys for State Defendants.

Timothy J. Helfrich, YTURRI ROSE, LLP, 89 SW Third Avenue, P.O. Box S, Ontario, OR 97914. Of Attorneys for Defendant Dr. Kenneth Little.

**Michael H. Simon, District Judge.**

Plaintiff Richard Anthony Jenkins, a prisoner incarcerated at Snake River Correctional

Institution ("SRCI"), brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that

defendants Steve Shelton, Aimee Hughes, Ashley Clements, Garth Gulick, and James Taylor

(the "State Defendants") acted with deliberate indifference towards Mr. Jenkins' medical needs in violation of the Eighth Amendment. Dr. Kenneth Little, a physician in Boise, Idaho, is also named as a defendant. In its previous opinion, the Court granted partial summary judgment dismissing several named state defendants against whom Mr. Jenkins failed to exhaust administrative remedies. EFC 95. The Court also granted summary judgement to the State Defendants on whether their refusal to refer Mr. Jenkins to an independent specialist amounted to deliberate indifference, finding it did not. *Id*.

Before the Court now is what remains of the State Defendants' Motion for Summary Judgment and Dr. Little's Motion to Dismiss for lack of personal jurisdiction. The Court deferred ruling on these matters pending the appointment of counsel for Mr. Jenkins, limited discovery, and supplemental briefing. *Id*. For summary judgment, the Court now addresses whether the State Defendants violated the Eighth Amendment with regards to how they treated Mr. Jenkins' pain. After consideration of the supplemental briefing, the Court GRANTS summary judgment in favor of the State Defendants. The Court also GRANTS Dr. Little's Motion to Dismiss for lack of personal jurisdiction.

## STANDARDS

### A. Motion for Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and citation omitted).

**B. Motion to Dismiss for Lack of Personal Jurisdiction**

On a motion to dismiss for lack of personal jurisdiction brought pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that the court's exercise of jurisdiction is proper. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citing *Scher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). When the court's determination is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Id*. (quotation marks and citation omitted). In resolving the motion on written materials, the court must "only inquire into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction." *Id*. (quotation marks omitted) (quoting *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995)). A plaintiff cannot solely rest on the bare allegations of its complaint, but uncontroverted allegations in the complaint must be taken as true. *Id*. Conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id*. (citing *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) and *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000)).

**BACKGROUND**

From November 30, 2011 until December 1, 2011, Mr. Jenkins, while in state custody at SRCI, was treated at a hospital after he collapsed during stair step exercises. At the hospital, a lumbar spine x-ray was taken and showed no acute abnormality. An MRI of the lumbar spine taken on December 1, 2011, only revealed evidence of associated small joint effusion in the back, suggesting an overuse problem. Mr. Jenkins was returned to SRCI, observed in the infirmary for a short time, and then returned to general population at SRCI.

On February 9, 2012, Garth Gulick, M.D., examined Mr. Jenkins for a second opinion consultation. Dr. Gulick noted that Mr. Jenkins had reported intermittent back pain without cause or association beginning in 2008. Dr. Gulick noted that injections, Medrol dose packs, and all medication except for Elavil had been unsuccessful in reducing the pain, and that a recent taper of Elavil had increased Mr. Jenkins' pain to a level of six or seven out of ten. On examination, Dr. Gulick observed that Mr. Jenkins walked slowly, but a lower back exam was negative for causes. Dr. Gulick ordered a lumbar spine x-ray and a trial of Pamelor.

Between February 9, 2012 and June 14, 2012, Mr. Jenkins was seen at sick call and by Dr. Joedean Elliot-Blakeslee several times for complaints of increasing low back pain. Mr. Jenkins requested stronger medication, physical therapy, and a wheelchair. On May 4, 2012, he received a Toradol injection. He was also approved to use the "wheelchair taxi service" to get him to and from his work at SRCI. Physical therapy, however, was not approved.

During a June 14, 2012, appointment with Dr. Elliot-Blakeslee for Mr. Jenkins' chronic low back pain, Dr. Elliot-Blakeslee noted that Mr. Jenkins' MRI and x-rays did not show serious defects and that, to date, he had tried all kinds of pain medications to no effect. Dr. Elliot-Blakeslee ordered a trial of Neurontin. A follow-up appointment took place on July 9, 2012. Dr. Elliot-Blakeslee explained to Mr. Jenkins that his MRI report from 2011 did not show any

spinal cord or nerve impingement, although mild degenerative joint disease in two facet joints was found. His Neurontin prescription was continued.

From August 6, 2012, through November 30, 2012, in response to his subjective pain complaints, Mr. Jenkins was examined several times by Dr. Elliot-Blakeslee and at least once by Dr. Gulick. Mr. Jenkins stated that he had tried all types of medications including non-steroidal anti-inflammatories ("NSAID"), tricyclics, Neurontin, and capsaicin, and that none of these helped his pain. Mr. Jenkins complained of pain involving his entire bilateral scapula and thoracic and lumbar areas down to his pelvis, in addition to shin and plantar fasciitis pain. Both physicians performed a battery of diagnostic tests that were inconclusive as to the source of Mr. Jenkins' pain. Dr. Gulick also recommended treatment with Cymbalta, which although the Therapeutic Level of Care ("TLC") committee approved, was discontinued because Mr. Jenkins reported it was ineffective. Mr. Jenkins was ultimately given a trial of Tramadol.

On January 7, 2013, Mr. Jenkins reported to Dr. Elliot-Blakeslee that, with Tramadol, he was able to start exercising again and could sleep better. He stated that his pain level had reduced from between eight and nine down to about four to five on a zero to ten point pain scale. Dr. Elliot-Blakeslee noted that multiple evaluations had been conducted and many types of medications had been prescribed in the past in response to Mr. Jenkins' chronic pain complaints. His Tramadol renewal was submitted to the TLC committee. The TLC committee approved a renewal of Tramadol for three months then a taper during an additional three-month period.

On February 27, 2013 and April 29, 2013, the TLC committee denied Mr. Jenkins' requests for a new lumbar spine MRI for lack of medically indicated necessity. Mr. Jenkins was given the option to purchase an MRI on his own.

On June 13, 2013, Mr. Jenkins was seen by Dr. Elliot-Blakeslee. Mr. Jenkins requested a refill of Tramadol and Neurontin, stating that they reduce his pain "a little." He stated that he hurts everywhere on his body and again requested an MRI of his lumbar spine. Dr. Elliot-Blakeslee noted that she suspected fibromyalgia and took Mr. Jenkins' requests to the TLC committee. The TLC committee denied Mr. Jenkins' request for a refill of Tramadol and Neurontin. Both Dr. Gulick and Dr. Elliot-Blakeslee examined Mr. Jenkins' x-rays and laboratory results, noting negative impressions, and concluding that there was no evidence that Tramadol and Neurontin were medically necessary.

On July 2, 2013, Dr. Elliot-Blakeslee saw Mr. Jenkins in response to his continued pain complaints. He was given a list of 13 different pain medications to choose from that TLC would allow. He did not want to try any of them and only wanted Tramadol and Neurontin. The MRI from 2011 was reviewed with him again with explanation that there was no pathology severe enough to cause the pain nor was it consistent with entrapped nerves.

On July 5, 2013, Mr. Jenkins reported to sick call stating that he had taken six Tylenol after breakfast and six more after lunch because of the pain and the fact that his Tramadol and Neurontin regimen had been stopped. He was informed about the harms of overuse of Tylenol and was scheduled for a provider's visit. After continued reports of pain on July 8, 2013, and a possible diagnosis of fibromyalgia by Dr. Elliot-Blakeslee, on July 10, 2013, the TLC committee approved a Tramadol and Neurontin regimen. Two weeks later (July 24, 2013), Mr. Jenkins reported to sick call with complaints about pain shooting up his right foot. A cane was issued pending an appointment with Dr. Elliot-Blakeslee on July 29, 2013. At the appointment, Dr. Elliot-Blakeslee discontinued Mr. Jenkins' use of a cane and instead advised him to use a crutch for two months. Dr. Elliot-Blakeslee also ordered a refill of Tramadol.

Mr. Jenkins continued to report pain from August, 2013, through October, 2013. He stated that, though he received medication, it was not as much as he needed and was not helping his pain. On October 24, 2013, Tramadol was discontinued and Mr. Jenkins was prescribed a crutch for a period of two months. On January 2, 2014, the TLC committee approved a lumbar spine MRI and a Neurontin and Ultram (a brand name of Tramadol) regimen.

Dr. Thomas Bristol saw Mr. Jenkins on January 24, 2014. Dr. Bristol noted mild disc degeneration of the lumbar region from the 2011 MRI. He also found mildly restricted range of motion in the neck and shoulders and stated he would "consider fibromyalgia." On February 3, 2014, Mr. Jenkins underwent a new lumbar spine MRI. The MRI showed a right paracentral disk protrusion focally distorting the thecal sac and displacing the right S1 nerve root at level L5-S1. The TLC committee approved Dr. Bristol's request for neurosurgical consultation for Mr. Jenkins on February 12, 2014.

Dr. Kenneth Little performed a L5-S1 hemilaminectomy, medial facetectomy, and microdiscectomy on Mr. Jenkins on May 20, 2014. On June 19, 2014, Dr. Little outlined a recovery plan for Mr. Jenkins. For purposes of Dr. Little's Motion to Dismiss, the Court takes as true Mr. Jenkins' allegation that Dr. Little originally prescribed Tramadol and Neurontin indefinitely. The medical record shows that Dr. Little noted Mr. Jenkins was making good progress and recommended a Tramadol regimen twice a day for the next three weeks, followed by a gradual taper as with his Neurontin. Mr. Jenkins was prescribed Neurontin for two weeks on July 17, 2014. On July 30, 2014, Tramadol and Neurontin were discontinued in accordance with Dr. Little's order.

After ongoing complaints of pain, on August 2, 2014, Mr. Jenkins received a Toradol injection for his back pain. Four days later on August 6, 2014, Mr. Jenkins reported that he had

taken 16 Tylenol pills within 24 hours. He was taken offsite to urgent care and discharged the same day when his blood tests showed minimal levels of acetaminophen. He was then held in the SRCI infirmary for observation until August 11, 2014. Mr. Jenkins did not report suicidal ideation but did state that he "just need[s] the Neurontin back." Mr. Jenkins' access to non-aspirin was restricted on Dr. Gulick's order. In the infirmary, Mr. Jenkins was prescribed Tramadol and limited doses of acetaminophen for two months to manage his pain.

The TLC committee discussed the plan of care for Mr. Jenkins' pain issues on August 13, 2014. Options discussed included another MRI, Neurontin, and Tramadol. The TLC committee did not approve any of these options, finding that no evidence supported that they were medically needed.

On October 22, 2014, Mr. Jenkins refused to get his medications. Mr. Jenkins contends that walking to get his medications was too painful and that the medications were not effective. Mr. Jenkins was sent offsite for a neurological consult with Dr. Stephen W. Asher on November 17, 2014. Dr. Asher found no abnormalities and reviewed the findings with Mr. Jenkins. On November 19, 2014, the TLC committee again found no medical support that Mr. Jenkins would benefit from a Neurontin regimen.

On November 25, 2014, Mr. Jenkins reported to sick call with severe back pain complaints but was unable to point to the area of his back in pain and was unwilling to participate in an examination by bending or stretching. Mr. Jenkins was instructed that he needed to try to stretch and stay active.

Lisa Koltes, M.D., frequently met with and examined Mr. Jenkins from February 17, 2015, through May 4, 2016. During this time, she conducted evaluations of Mr. Jenkins' alleged symptoms, reviewed his file, and engaged in diagnostic testing. After reporting that nothing was

working to alleviate his pain, from June 4, 2015 through July 31, 2015, Mr. Jenkins was put on a complete work and activity restriction of no lifting greater than ten pounds. During this time, Dr. Koltes attempted to treat Mr. Jenkins with Gabapentin (the generic form of Neurontin), Prednisone, and Doxepin.

On January 6, 2016, the TLC committee approved a request for another MRI of the lumbosacral spine. They denied, however, Mr. Jenkins' request for Neurontin, finding that it was not medically necessary. The TLC committee advised Mr. Jenkins to review his other options.

On January 12, 2016, Dr. Koltes discontinued Mr. Jenkins' Doxepin prescription because he expressed fear of weight gain and wished to stop taking it. Three days later, Dr. Koltes reviewed with Mr. Jenkins all of the medications that had been prescribed to relieve his subjective pain complaints. Dr. Koltes also reviewed the non-narcotic options for pain control. She ultimately recommended Fluoxetine, which Mr. Jenkins was willing to try. The TLC committee approved Fluoxetine on January 15, 2016.

On January 26, 2016, Dr. Koltes discussed the Fluoxetine prescription with Mr. Jenkins. Mr. Jenkins stated "I know it's not going to work." Mr. Jenkins wanted Tramadol prescribed instead. Dr. Koltes noted that she had previously explained how Fluoxetine could help with chronic pain because some antidepressants work on the same receptors of serotonin and norepinephrine as does Tramadol. Mr. Jenkins indicated he was willing to proceed with Fluoxetine.

On February 3, 2016, Mr. Jenkins reported to sick call with complaints of shooting leg pains, tingling, and numbness from his right buttock to his right foot. He also reported constant headaches on the left side of his head. A follow-up appointment was scheduled with Dr. Koltes. On February 12, 2016, Mr. Jenkins again expressed doubt about the effectiveness of Fluoxetine.

Dr. Koltes informed Mr. Jenkins that he needed to give Fluoxetine time to take effect and that it was not an instant cure.

On February 19, 2016, Mr. Jenkins obtained a lumbosacral MRI, taken without contrast, at an offsite imaging facility. The MRI did not show any abnormalities demonstrating a medical need for surgery. From February 24, 2016 through March 24, 2016, Mr. Jenkins repeatedly reported migraines, back pain, and pain in his right side. Medical staff conducted examinations each time and found no underlying medical causes. Mr. Jenkins declined NSAIDs. Dr. Koltes explained to Mr. Jenkins that staying in bed until 1:00 p.m. could be exacerbating his headaches and chronic pain and informed him that he needs to exercise and do neck stretches to help with the headaches. Dr. Koltes also read Mr. Jenkins his medical reports and explained that the reports do not account for his subjective complaints. He requested a neurosurgical referral, which the TLC committee denied, concluding that there were no clinical findings to support surgical or neurological evaluation.

Mr. Jenkins reported migraines, back pain, and leg pain to Dr. Koltes during an appointment on March 24, 2016. Mr. Jenkins grew agitated and his behavior began to escalate during the appointment, at which time Dr. Koltes terminated the visit. She observed that Mr. Jenkins could easily get up from his chair and moved easily with a cane. Dr. Koltes opined that Mr. Jenkins was not currently at risk of losing his ability to walk. Dr. Koltes also noted that Mr. Jenkins had not been walking to get his medications regularly, noting that he only went to get Fluoxetine on February 18, 25, 29 and March 19, 20, and 23, 2016.

On April 15, 2016, Mr. Jenkins complained of persistent symptoms and asked what alternative treatment remained available for his pain. He admitted to not exercising and to staying in bed due to pain. He refused an increase in blood pressure medicine and requested

special orthopedic shoes that he believed would help his chronic pain. Dr. Koltes observed that Mr. Jenkins could bend down to put on his shoes without difficulty, that he was chronically noncompliant with medications and lifestyle recommendations, and that no objective findings supported his ongoing subjective complaints.

On April 21, 2016, Mr. Jenkins reported to sick call with chronic lower back pain and neck pain rated at a seven out of ten. He stated that the new medication he was on was not effective and requested a follow-up appointment with Dr. Koltes. The requested appointment took place on April 27, 2016. Mr. Jenkins reported tingling and numbness in his neck, as well as numbness to his lips. An examination revealed no explanation for his complaints. Dr. Koltes noted that Mr. Jenkins had a history of exams, imaging studies, and lab results that did not explain his subjective complaints of pain. After reviewing Mr. Jenkins' lumbosacral MRI impression, Dr. Koltes recommended neck and back stretches, capsaicin cream, walking exercises, and weight loss. Mr. Jenkins was advised to take his Fluoxetine consistently for at least one month.

The TLC committee approved consultation with Dr. Gulick as a new medical provider on May 4, 2016, but denied a request for outside consultation from a rheumatologist or neurologist for lack of clinical findings to support such a referral. On May 13, 2016, Mr. Jenkins' cane use was renewed for one year. Dr. Gulick noted observing that Mr. Jenkins does not always use his cane.

On May 16, 2016, Dr. Gulick examined Mr. Jenkins. He complained of pain to his neck, left shoulder, low back, buttock, thigh, and calf. He reported numbness and tingling in his right foot. Dr. Gulick ordered more than five diagnostic tests to measure inflammation and infection in

the body and aid in disease identification and diagnosis. On June 1, 2016, Fluoxetine was discontinued because of Mr. Jenkins' continued refusal to take this medication as directed.

Since his incarceration began, Mr. Jenkins has been prescribed or treated with Elavil, Effexor, Wellbutrin, Valium, Celexa, Pamelor, Cymbalta, Ultram/Tramadol, Neurontin/Gabapentin, Divalproex, Nortriptyline, Toradol, Baclofen, Desipramine, Prednisone, Doxepin, Fluoxetine, NSAIDs, and Tylenol. Although Mr. Jenkins has complained of migraines, Dr. Koltes found his symptoms are more consistent with tension headaches than migraines based on her numerous evaluations of Mr. Jenkins and review of his medical records.

Dr. Elliot-Blakeslee, now deceased, diagnosed Mr. Jenkins with fibromyalgia in 2013. Dr. Koltes agrees that Mr. Jenkins may very well have fibromyalgia but contends that she reviewed recommended treatments for fibromyalgia with him. She attests that appropriate lifestyle interventions for fibromyalgia have also been encouraged with minimal success. According to Dr. Koltes, Mr. Jenkins' subjective complaints are inconsistent with clinical observations and diagnostic testing. X-rays, ultrasounds, MRIs, and testing for sensation, reflexes, and strength generally showed his subjective complains of severe pain greatly exceeded objective medical findings.

## DISCUSSION

### A. Eighth Amendment Claim

Mr. Jenkins contends that the State Defendants violated the Eighth Amendment in the treatment of his pain. Primarily, he argues that the treatment he received was constitutionally deficient because State Defendants refused to prescribe Tramadol and Neurontin. Mr. Jenkins also alleges and offers limited argument that not prescribing post-operative physical therapy amounted to an Eighth Amendment violation.

1.  **Standards**

The treatment a prisoner receives in prison and the conditions of his confinement are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). As the Supreme Court has explained,

> The [Eighth] Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks and citations omitted). A prison official violates a prisoner's Eighth Amendment rights only when the claim satisfies both an objective and subjective inquiry. *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000). To meet the objective element, in the context of a claim for failure to provide medical care, a plaintiff must establish a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A serious medical need is the kind of injury that "a reasonable doctor or patient would find important and worthy of comment or treatment; . . . that significantly affects an individual's daily activities; or [causes] chronic and substantial pain." *Lopez*, 203 F.3d at 1131 (citation omitted). The subjective inquiry requires a showing that corrections officers acted with deliberate indifference to a plaintiff's serious medical needs. *Id*. at 1132. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837. A prison official also is not liable for deliberate indifference if the official responded reasonably to the prisoner's needs. *Id*. at 844.

The State Defendants do not contest that Mr. Jenkins' chronic pain was a serious medical need requiring ongoing treatment. Instead, the State Defendants contend that they did not act with indifference towards those needs because they continued to treat Mr. Jenkins reasonably

and on a regular basis. To the extent that the treatment was not Mr. Jenkins' desired course of

treatment, the State Defendants argue that the claim fails because it is nonactionable difference

in medical opinion.

### 2. Refusing to Prescribe Tramadol and Neurontin

Mr. Jenkins argues that medication-based treatment can be constitutionally-deficient if a

prison official knows of and disregards a substantial likelihood that the medication will be

ineffective at relieving chronic and substantial pain, or will cause serious harm to the inmate.

When a prisoner is arguing that a different course of treatment should have been followed, the

prisoner must show that the course of treatment chosen "was medically unacceptable under the

circumstances" and was chosen "in conscious disregard of an excessive risk" to plaintiff's health.

*Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (citation omitted). A prisoner's mere

disagreement with his or her medical treatment, however, is not actionable under the Eighth

Amendment. *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) ("However, a mere

'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate

indifference.'" (alterations in original) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th

Cir. 1996))); *Mentzer v. Vaikutyte*, 2016 WL 4059202, at *3 (C.D. Cal. July 27, 2016)

("Similarly, an inmate's disagreement with his medical treatment or a difference of opinion over

the type or course of treatment does not support an Eighth Amendment claim."); *McGeever v.

Vitells*, 2014 WL 1876268, at *3 (D. Or. May 8, 2014) ("The failure to administer a different

narcotic pain medication in these circumstances does not rise to the level of a constitutional

infringement . . . .").

Regarding Mr. Jenkins' claim that he should have been prescribed Tramadol, the Court

notes that Tramadol is a narcotic. As this Court stated in its previous opinion, prisoners are not

entitled to be prescribed narcotics, absent complicating factors not present in this case. *See*

*Heilbrun v. Villanueva*, 2016 WL 3200121, at *4 (D. Or. June 7, 2016); *Jackson v. Multnomah Cty.*, 2013 WL 428456, at *6 (D. Or. Feb. 4, 2013); *Fields v. Roberts*, 2010 WL 1407679, at *4 (E.D. Cal. Apr. 7, 2010); *cf. Masden v. Risenhoover*, 2013 WL 1345189, at *6, 17 (N.D. Cal. Mar. 29, 2013) (could not take nonsteroidal anti-inflammatory drugs due to liver problems).

Mr. Jenkins asserts that the ineffectiveness of other medications he has tried warrants Tramadol. This is inconsistent, however, with the declaration of Dr. Koltes, wherein she states that she explained to Mr. Jenkins how Fluoxetine works on the same receptors in the brain as Tramadol, which is why he was being prescribed Fluoxetine. It is understandable, given Mr. Jenkins' unsuccessful history with medication, that he was reluctant to try Fluoxetine. But a reluctance to try medication or a difference in opinion as to the best medication does not create a constitutional violation. Mr. Jenkins did not provide any evidence disputing that Fluoxetine and Tramadol work in the same way to support his claim that it would have been ineffective compared to Tramadol. Mr. Jenkins' assertion that Tramadol was required and effective is also inconsistent with the medical evidence that even when he was taking Tramadol, he continued to complain of pain.

Concerning Neurontin, as discussed above, it is not an Eighth Amendment violation to refuse an inmate the medication of his choice. *See Toguchi*, 391 F.3d at 1058; *Mentzer*, 2016 WL 4059202, at *3; *McGeever*, 2014 WL 1876268, at *3. Mr. Jenkins provides no evidence showing that Neurontin was necessary, and to the contrary, the evidence shows that it was not effective.

The evidence in the record does not support the conclusion that the variety or types of medications made available to Mr. Jenkins, or the frequency at which such medication was made available, was medically unacceptable. The State Defendants evaluated Mr. Jenkins because of his pain on many occasions before his surgery, at times placing him on Tramadol or Neurontin,

and sometimes both. They were not always effective. Mr. Jenkins described Neurontin as not helpful and described them in combination as only helping "a little." Even while taking them in combination, he continued to report problems with pain. The State Defendants continued to respond to Mr. Jenkins' complaints of pain by evaluating him and offering him a variety of treatment options.

After surgery, the State Defendants followed Dr. Little's recommended course of treatment, discontinuing Tramadol and Neurontin. When Mr. Jenkins continued to complain of pain, the State Defendants provided various different medications. Whether continuing with Tramadol and Neurontin would have been a better course of treatment is a matter of Mr. Jenkins disagreeing with his medical treatment, and is not actionable under the Eighth Amendment. It is at most a claim for medical negligence. *Toguchi*, 391 F.3d at 1057 ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."(citation omitted)); *Nelson v. Oregon Dep't of Corr.*, 2018 WL 443458, at *4 (D. Or. Jan. 12, 2018) ("[I]nadequate medical treatment due to negligence or inadvertence does not rise to the level of a constitutional violation." (*citing Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976))). Mr. Jenkins fails to demonstrate that the State Defendants acted in conscious disregard of an excessive risk to Mr. Jenkins' health by following Dr. Little's treatment plan to discontinue Tramadol and Neurontin.

Mr. Jenkins also attended a neurological consult after his surgery, which showed no ongoing need for treatment with Tramadol or Neurontin. Additionally, after his surgery Mr. Jenkins was treated for a short period with gabapentin, the generic form of Neurontin, in combination with medications other than Tramadol. This did not appear to help his symptoms. The evidence shows that Mr. Jenkins was reluctant to take medication other than Tramadol and

Neurontin. Even when he agreed to try medication, such as Fluoxetine, he did not take it consistently or as directed. Although Mr. Jenkins contends that Tramadol was the only successful treatment for his possible fibromyalgia, according to Dr. Koltes, narcotic pain medication is not generally prescribed for fibromyalgia. Mr. Jenkins provided no evidence to dispute this. Moreover, as noted above, the record does not support that Tramadol (or Neurontin) was particularly effective.

The report of Michele Nielson, RN, offered by Mr. Jenkins in support of his opposition to summary judgment, fails to create a genuine issue for trial. The Court does not consider Ms. Nielson's legal conclusion that the State Defendants' actions were deliberately indifferent. *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." (emphasis in original) (quoting *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1016 (9th Cir. 2004))). Ms. Nielson's report only states that Mr. Jenkins would have "been able to obtain adequate follow-up and medications" had he not been a prisoner. Courts in this district have previously held that the access an inmate would have had to a particular treatment, but for his incarceration, is insufficient evidence of deliberate indifference to survive summary judgment. *See Nelson*, 2018 WL 443458, at *4; *Woodroffe v. Oregon*, 2015 WL 2125908, at *4 (D. Or. May 6, 2015). Although Ms. Neilson implies that Mr. Jenkins' treatment was inadequate, because the State Defendants continued to treat Mr. Jenkins, Ms. Nielson's conclusions, at best, support only a theory of medical negligence against the State Defendants, not a Constitutional violation.

Mr. Jenkins also asserts that the State Defendants contacted Dr. Little and requested that he change Mr. Jenkins' treatment plan to stop the dispensation of Tramadol and Neurontin.

There is no evidence to support this contention. Further, the State Defendants were under no obligation to follow Dr. Little's recommendation. *See, e.g.*, *Fields v. Roberts*, 2010 WL 1407679, at *4 (E.D. Cal. Apr. 7, 2010) (finding that the refusal to prescribe narcotic pain medication when an outside doctor recommended it constitutes a difference in medical opinion inadequate to support an Eighth Amendment claim); *see also Villanueva*, 2016 WL 3200121, at *4; *Woodroffe*, 2015 WL 2125908, at *4-5.

Mr. Jenkins also contends that his alleged overdose on non-prescription pain relievers supports his claim of deliberate indifference because, but for the State Defendants' refusal to provide Tramadol and Neurontin, Mr. Jenkins would not have taken more pain relievers than recommended. Mr. Jenkins first reported taking a potentially harmful amount of Tylenol in July 2013. He was advised of the risks of overuse. He did not report taking more Tylenol than recommended again until more than a year later in August 2014, notwithstanding continued reports of pain throughout this time. After his second report, he was rushed offsite for testing and kept for observation despite the offsite blood test results showing that he did not overdose. Mr. Jenkins claimed he was not suicidal.

After the purported overdose, the State Defendants restricted Mr. Jenkins' access to over-the-counter medications, responding without indifference in doing so. The State Defendants acted in this cautionary manner even though medical testing showed that Mr. Jenkins had not ingested a dangerous amount of non-aspirin painkillers. No rational trier of fact could find that the State Defendants were deliberately indifferent to the risk of Mr. Jenkins' harming himself when (1) medical evidence shows that he did not harm himself, (2) he previously attested that he had no desire to harm himself, and (3) he later was placed on restricted access to painkillers so that he could not harm himself.

Given the consistent medical treatment provided to Mr. Jenkins by the State Defendants, the objective medical evidence in the record, and the multiple opinions of different doctors regarding the medical necessity (or lack thereof) for the specific medications requested by Mr. Jenkins, Mr. Jenkins fails to raise a material issue of fact that the State Defendants acted with the requisite deliberate indifference regarding the treatment of Mr. Jenkins' pain. Mr. Jenkins' facts, therefore, show only a difference of medical opinion and not a triable constitutional violation.

### 3. Lack of Post-operative Physical Therapy

Mr. Jenkins explains that he was never provided post-operative physical therapy but does not actually assert that the State Defendants were deliberately indifferent to his pain by not prescribing physical therapy. Because the decision to prescribe physical therapy is a medical choice, even if Mr. Jenkins intended to argue that this supported his Eighth Amendment claim, this is again at most a claim for professional negligence, rather than deliberate indifference. Mr. Jenkins does not present argument, evidence, or authority that failing to prescribe physical therapy was medically unacceptable under the circumstances. Additionally, Ms. Neilson does not offer any expert opinion on this point. Accordingly, Mr. Jenkins fails to demonstrate a genuine dispute as to any issue of material fact.

## B. Jurisdiction over Dr. Little

Mr. Jenkins alleges that the Court has general jurisdiction over Dr. Little because he must necessarily treat a large volume of Oregon inmates. Alternatively, Mr. Jenkins contends that Dr. Little is subject to specific jurisdiction because he has availed himself of Oregon law and Mr. Jenkins' claim in this case arises out of Dr. Little's contacts with Oregon.

### 1. Inferences from Interrogatories

The Court previously deferred ruling on Dr. Little's motion to dismiss, partially to allow Mr. Jenkins limited discovery relating to the question of the Court's personal jurisdiction over Dr. Little. Mr. Jenkins sent Dr. Little a request for production and interrogatories to which Dr. Little responded on July 19, 2017. ECF 111-3. Mr. Jenkins' first interrogatory requested information including the number of patients incarcerated in Oregon who Dr. Little treated, the times each patient was treated, and the dates of treatment. Dr. Little responded by stating that to respond to the question of the "number" of patients treated, his team was "having to build a special report for this specific data. The inmates are scheduled under high security, and it has proven to be difficult to pull their information." Dr. Little thus objected that to respond would be unduly burdensome. Mr. Jenkins argues in his supplemental brief that a reasonable inference from this interrogatory response is that Dr. Little treated numerous patients from Oregon and thus general jurisdiction is appropriate. Dr. Little responds that the inference that he treated numerous patients is not necessarily supported by his interrogatory response.

The Court notes that no discovery motion was filed nor was any informal attempt made with the Court to resolve any dispute to obtain discovery in response to this interrogatory. Further, no evidentiary motion is before the Court now. Regardless, because the Court would find no general jurisdiction even if Dr. Little treated numerous patients that had been incarcerated in Oregon (because Dr. Little attests that he only treated patients in Idaho), there is no need for the Court to determine what inference should be drawn from Dr. Little's interrogatory response.

### 2. Legal Standards

Unless a federal statute governs personal jurisdiction, a district court applies the law of the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (citing

*Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998)). Oregon's long-arm statute is co-extensive with constitutional standards. *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990) (citing Or. R. Civ. P. 4(L)); *Oregon ex rel. Hydraulic Servocontrols Corp. v. Dale*, 657 P.2d 211, 212 (Or. 1982). Thus, this Court need only determine whether its exercise of personal jurisdiction over Dr. Little would offend constitutional due process requirements. *See Boschetto*, 539 F.3d at 1015; *see also Hydraulic Servocontrols*, 657 P.2d at 212.

Due process requires that the defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted). The Supreme Court has rejected the application of "mechanical" tests to determine personal jurisdiction. *Id.* at 319; *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). Rather, a court should consider the "quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." *Int'l Shoe*, 326 U.S. at 319.

"There are two forms of personal jurisdiction that a forum state may exercise over a nonresident defendant—general jurisdiction and specific jurisdiction." *Boschetto*, 539 F.3d at 1016. A court has general personal jurisdiction over a defendant whose contacts with the forum are "so 'continuous and systematic' as to render them essentially at home in the forum state." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (citing *Goodyear v. Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)). If the court lacks general personal jurisdiction, it may have specific personal jurisdiction if the defendant has certain minimum

contacts with the forum state, the controversy arose out of those contacts, and the exercise of jurisdiction is reasonable. *See Burger King*, 471 U.S. at 472-74.

### 3. General Jurisdiction

To establish general jurisdiction, a plaintiff must demonstrate that the defendant has the kind of "continuous and systematic" contacts with the forum state that "approximate physical presence." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). The Court does not have general jurisdiction over Dr. Little because Dr. Little is not an Oregon resident, does not work for an Oregon employer, and did not treat Mr. Jenkins in Oregon (nor are there allegations that he sees any patients in Oregon). *Cubbage v. Merchent*, 744 F.2d 665, 667-68 (9th Cir. 1984) (finding no general jurisdiction over foreign-state doctors who did not live, practice, or treat patients in California); *Wright v. Yackley*, 459 F.2d 287, 290 (9th Cir. 1972) ("Medical services in particular should not be proscribed by the doctor's concerns as to where the patient may carry the consequences of his treatment and in what distant lands he may be called upon to defend it. . . . First, the amount of contact between defendant and forum state is determined by the chance occurrence of a resident of the forum state seeking treatment by the doctor while in the latter's state. From the very nature of the average doctor's localized practice, there is no systematic or continuing effort on the part of the doctor to provide services which are to be felt in the forum state."); *Kimbro v. Miranda*, 2013 WL 5530346, at *3 (E.D. Cal. Oct. 4, 2013) (finding no general jurisdiction over a foreign-state doctor who treated a California State prisoner in Nevada even though he was paid by the state of California).

### 4. Specific Jurisdiction

The Ninth Circuit applies a three-part test to determine if the exercise of specific jurisdiction over a nonresident defendant is appropriate:

> (1)    The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2)    the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3)    the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable.

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quoting *Schwarzenegger*, 374 F.3d at 802). The plaintiff bears the burden as to the first two prongs, but if both are established, then "the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger*, 374 F.3d at 802).[1]

The first prong embodies two distinct, although sometimes conflated, concepts: purposeful availment and purposeful direction. *See Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012); *Brayton Purcell*, 606 F.3d at 1128. A purposeful availment analysis is proper for a claim of negligence. *Holland America Line Inc. v. Wartsila North America Inc.*, 485 F.3d 450, 460 (9th Cir. 2007).

"To have purposefully availed itself of the privilege of doing business in the forum, a defendant must have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto*, 539 F.3d at 1016 (quotation marks and citation omitted). A defendant may also purposely avail himself of the benefits of a forum by "create[ing] 'continuing obligations' between himself and the residents of the forum." *Burger King*, 471 U.S. at 475–76 (citations omitted). These continuing obligations must create a

---

[1] Because the Court finds that Dr. Little has not purposefully availed himself of the protection of Oregon law, the Court does not reach the second or third prongs.

"substantial connection" between the defendant and the forum state that is more than merely "random, fortuitous or attenuated." *Boschetto*, 539 F.3d at 479-80.

Mr. Jenkins contends that Dr. Little had the following contacts with Oregon: (1) he treated Oregon inmates; (2) he communicated with the Oregon Department of Corrections in regards to that treatment; and (3) he sent a modified prescription from Idaho to Oregon, which tapered and ended Mr. Jenkins' access to Ultram and Neurontin. Because Mr. Jenkins' claim of negligence against Dr. Little arises from Dr. Little sending the modified prescription, the Court addresses that contact first.

The Ninth Circuit has held that when a physician issues a prescription to an out-of-state patient while they are in the physician's state, if he later sends a copy of that prescription to the patient across state lines, the physician does not become subject to personal jurisdiction in the recipient-patient's state because of that act. *Wright*, 459 F.2d at 288-89. The court reasoned that any malpractice in the issuance of the prescription took place in the physician's state when he wrote the original prescription. *Id*. at 288. The subsequent mailing of the copy was a minimal contact insufficient to satisfy due process. *Id*. at 289, n. 4; *see also Hill v. United States*, 815 F. Supp. 373, 376-77 (D. Colo. 1993) (finding no jurisdiction over an Arizona physician who called an out-of-state hospital to inquire about a patient's care and recommended certain food based on his diagnosis of the patient's condition in Arizona).

Mr. Jenkins asserts that Dr. Little originally provided Mr. Jenkins with an open-ended prescription for Neurontin and Tramadol (Ultram) in Idaho, which, allegedly, Dr. Little then later modified at the request of the State Defendants. Dr. Little provided the first prescription of Ultram after Mr. Jenkins' surgery on May 20, 2014. ECF 91 at 14. This prescription was for 80 pills, with no refills. *Id.* Mr. Jenkins had a post-operative appointment with Dr. Little in Idaho on

June 19, 2014. ECF 91 at 23. Dr. Little recommended Ultram 100mg two times per day for three weeks "and then gradual taper, as with his Neurontin." *Id.* Because the record reflects that both the original prescription and second prescription were issued by Dr. Little following appointments with Mr. Jenkins in Idaho, even if Dr. Little sent those prescriptions to the State Defendants in Oregon, the contacts here are the same as those found to be insufficient for jurisdiction in *Wright*.

Oregon citizens, state institutions like SRCI, and inmates have a strong interest in access to medical care from skilled practitioners. There is a real concern, as the Ninth Circuit expressed in *Wright*, that finding jurisdiction under Oregon's long-arm statute in this case would likely limit the availability of medical care for Oregon residents in the future because out-of-state practitioners may refuse to treat Oregon patients for fear of being haled into Oregon courts. *Wright*, 459 F.2d at 290-91 ("Finally, the forum state's natural interest in the protection of its citizens is here countered by an interest in their access to medical services whenever needed. In our opinion, a state's dominant interest on behalf of its citizens in such a case as this is not that they should be free from injury by out-of-state doctors, but rather that they should be able to secure adequate medical services to meet their needs wherever they may go."). The reality of modern medicine is that prescription medications are part of a patient's treatment.

Dr. Little's communications with the Oregon Department of Corrections and his treatment of Oregon patients in Idaho are also insufficient contacts to establish specific jurisdiction. *See Picot v. Weston*, 780 F.3d 1206, 1212-13 (9th Cir. 2015) (finding no specific jurisdiction when Michigander performed his duties almost entirely in Michigan, but he corresponded regularly with his Californian counterpart and twice visited California to further their common enterprise); *Sher v. Johnson*, 911 F.2d 1357, 1366 (9th Cir. 1990) (finding no

specific jurisdiction over partners of an out-of-state law firm when the partners resided and were licensed in their state, even though they communicated with and visited the plaintiff in his home state); *see also Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985) ("The making of telephone calls and the sending of letters to the forum state [is] legally insufficient to enable the court to exercise personal jurisdiction over the non-resident defendant.").

## CONCLUSION

The Court GRANTS the remainder of State Defendants' Motion for Summary Judgment (ECF 51). The claims against the State Defendants are dismissed with prejudice. The Court also GRANTS Dr. Kenneth Little's Motion to Dismiss (ECF 70) because the Court does not have personal jurisdiction over Dr. Little. The claims against Dr. Little are dismissed without prejudice. The Court does not revoke Plaintiff's IFP status.

**IT IS SO ORDERED**.

DATED this 28th day of March, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge